IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JAMES DEMARCO,  et al.,<br><br>    Plaintiff,<br><br><br><br><br><br><br><br>            vs.<br><br><br>MICHAEL LAPAY, et al.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART LAPAY DEFENDANTS' MOTION TO DISMISS AND GRANTING PRUDENTIAL  DEFENDANTS' MOTION TO DISMISS<br><br><br><br>Case No. 2:09-CV-190 TS |

This issue is before the Court on Defendants' LaPay, Paladin Development Partners, Murphy, Bryant and Conabee (LaPay Defendants) Motion to Dismiss and a separate Motion to Dismiss filed by Defendants' Peterson, Shoaf, Orrell, West, Stoner and Prudential Utah Real Estate (Prudential Defendants).

The Complaint alleges seven causes of action: 1) Federal Securities Violation; 2) Defendants Engaged in a Common Scheme to Defraud, Commited Fraud against Plaintiffs, and Conspired to Deny Protections and Rights of Plaintiffs under the Law; 3) Defendants Recklessly or Intentionally Violated State and Federal Securities Law; 4) Defendant Wrona Breached his

Duty and Committed Malpractice as the Real Estate Broker; 5) Defendants Breached the Contract; Induced Further Performance of Plaintiff Through Fraudulent Means, Misrepresentations, Dishonesty, and Intimidation; Acted in Bad Faith; Unduly Subjected Plaintiffs to Risk; Failed to Effect Cures; Damaged Plaintiffs by Their Self-Dealing; As Well As Other Unconscionable Actions; 6) Defendant Wrona's Breach of Professional Responsibility as an Attorney, Malpractice, Misrepresentations, and Furtherance of Conspiracy; 7)  Costs, Interest and Attorney's Fees.

The LaPay Defendants seek dismissal of the First, Second, Third and Seventh Causes of Action, The Prudential Defendants join generally the LaPay Defendants' Motion to Dismiss adding their own substantive argument regarding the second cause of action and also seek dismissal of the Fifth Cause of Action as to them.  This Motion to Dismiss does not address the Fourth and Sixth Causes of Action against Defendant Wrona.  Plaintiffs concede the dismissal of the Fifth Cause of Action as to the Prudential Defendants.[1]  Therefore the Court will not address that issue.

For the reasons stated below the Court will Grant Defendants' Motions as to the First, Second, and Third Causes of Action.  As stated above, Defendants' LaPay do not contest the Fifth Cause of Action, and Plaintiffs have conceded the Fifth Cause of Action be dismissed as to the Prudential Defendants.  The Motion to Dismiss will be denied as to the Seventh Cause of Action.

## I. Factual Background

The following allegations are taken from the Complaint and are deemed as true for the

---

[1]Docket No. 18 at 2, and Tr. at 11:9-14.

purposes of this motion.  Plaintiffs entered into contracts as buyers to purchase condominiums located in Park City, Utah.[2]  Plaintiffs routinely mention multiple contracts, but only one contract was attached to the Complaint as an example.  Plaintiffs assume the other contracts are similar.[3]  Additionally, in their Complaint, Plaintiffs list four specific properties which are presumably the subject matter of this suit, however, within the Complaint when discussing issues with the property they do not specify which unit has the problem, or if all of the units suffer from the exact same defects and harms.[4]

Plaintiffs allege that Defendants LaPay, Peterson, Shoaf, Orrell, West and Stoner acted on their own behalf and/or as agents for Prudential Utah Real Estate with respect to said contracts.[5]  Paladin Development Partners, L.L.C., which is managed by W. Okland, B. Okland, LaPay, Murphy, Bryant and Conabee, is the developer and seller with regard to the contracts.[6]

Plaintiffs assert that these contracts were securities as defined under 15 U.S.C. § 77, and were sold through interstate commerce, unregistered and without a prospectus, while not exempt and therefore in violation of that section.[7]  The contract attached to the Complaint is dated March 7, 2006, and this action was filed three years later on March 3, 2009.[8]  Plaintiffs claim the loss of

---

[2]Complaint, Docket No. 1, at ¶ 6, 15, 18.

[3]*Id*. at ¶¶ 5-6.

[4]*Id*. at ¶ 18.

[5]*Id*. at ¶ 20.

[6]*Id*. at ¶¶ 22, 24.

[7]*Id*. at ¶¶ 7-11.

[8]*Id*. at 1, Complaint Ex. A at pg. 33.

money and business opportunity.

Plaintiffs claim that the Utah Administrative Code Rule R162-6.2.3 requires the form *Real Estate Purchase Contract for Residential Construction* be used for all transactions for the construction of dwellings to be built or are under construction for which a Certificate of Occupancy (C.O.) has not been issued.[9]  Plaintiffs claim that this form was not used, that they were unaware of the existence of a standard contract and were not made aware of any differences between the "required" contract and the ones they signed.[10]  Plaintiffs especially complain about the differences in provisions regarding the earnest money deposit and allege that use of the "required" contract would have changed the way Defendants were able to use the deposit.[11]  The "required" contract apparently requires timely construction before application of the earnest money deposit, while the earnest money in this case was released to Defendants for their use before closing, causing an alleged substantial risk of loss to Plaintiffs.[12]  The "required" contract also requires the earnest money deposit to be held by a fiduciary, pending its application against the purchase price at closing.[13]  It is this deviation, allowing Defendants to use the earnest deposit that Plaintiffs claim changed the nature of the Real Estate Contract into an unregistered security.[14]  Plaintiffs further allege that the deviations constitute a common scheme to defraud

---

[9]Docket No. 1, at ¶ 35.

[10]*Id.* at ¶ 36.

[11]*Id.* at ¶ 39.

[12]*Id.*

[13]*Id.* at ¶41.

[14]*Id.* at ¶ 40.

Plaintiffs and caused direct or indirect damage.[15]  Plaintiffs mention a scheme of a specific selection process but do not explain what the process was, what it related to, or how it affected them.[16]

Plaintiffs allege Defendants breached the Contract by not timely performing because none of the units were substantially completed within the Contract time frame.  Plaintiffs allege that no C.O. has been issued, but also state that a temporary C.O. was fraudulently obtained through misrepresentations to Park City officials that the landscaping was the only thing left to be completed, when in fact Plaintiffs allege there were other outstanding items and code violations.[17]  This temporary C.O. was, allegedly, the critical factor in inducing one of the units to close.[18]  Plaintiffs also state that Park City officials suggested that absent a C.O., anyone in possession could be evicted, but the Complaint does not state that any evictions have actually occurred.[19]  At the time of filing, the outstanding items prevented the issuance of a C.O and the temporary C.O. expired in 2007 (two years before this action was filed).

Plaintiffs allege that, prior to closing, Defendants' engineer made them aware of foundational site problems regarding, at least, the lack of proper soil compaction and that Defendants failed to disclose such information.[20]  It is alleged that Defendants later admitted

---

[15]*Id*. at ¶¶ 45-46.

[16]*Id*. at ¶¶ 52-54.

[17]*Id*. at ¶¶ 71, 73-74.

[18]*Id*. at ¶¶ 67, 71.

[19]*Id*. at ¶ 72.

[20]*Id*. at ¶ 80.

such knowledge and their attempt to cover it up, by making excuses about the way the foundation was poured, knowing that such a defect would obstruct closing.[21]   Plaintiffs claim the stated excuses implied that the rest of the site was done properly and without defect.[22]   Plaintiffs assert that they asked for specifics on work that was to begin on a soil settlement issue but never received a response.[23]

Plaintiffs' Complaint then proceeds to state in detail other defects purportedly caused by the lack of compaction, including defects with the way the garage slab was cut, the type of material used, the unleveling of the spa slab, front door bolts shifting out of alignment, the pooling of water in garages and entry ways, road sinkage, and the misdirection of running water.[24]   Plaintiffs allege other problems include furnace and water heater malfunctions due to inadequate venting and building code violations.[25]   Plaintiffs allege code violations regarding access to the water heater and furnace blockage in the mechanical room, egress windows, and the lack of an elevator phone.[26]   Plaintiffs allege Defendants purposefully had the building inspection completed before installing the improper furnace blockage, in order to obtain a certificate to close.[27]   Plaintiffs allege that, when questioned, Defendants made up excuses like, only a new

---

[21]*Id.*

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]*Id.* at ¶ 81.

[26]*Id.* at ¶¶ 82-84.

[27]*Id.* at ¶ 82.

model of a window being available, in the case of the window issues.[28]  Defendants also

allegedly told Plaintiffs and other users to make sure to bring a cell phone while in the elevator,

but simultaneously instructed them not to let the inspector know.[29]  Plaintiffs cite to other

persistent failures including problems with the shower and water infiltration, excessive cracking

of beams, warped windows and improperly installed weather stripping, improper installation of

sliding doors, lack of screen door installation, improper ventilation in the attic, dripping pipe

vents in the attic, rusty drip in the laundry drain, lack of a step for the hot tub, and electrical

conduits connecting hot tubs laid across concrete.[30]  City records show only one inspection

performed during the course of the work.[31]

      Plaintiffs allege that Defendants were dishonest because they would pick the locks on

units and damage premises in an effort to take parts from fully inspected units and install them in

other units to satisfy otherwise inoperative conditions.[32]  Defendants apparently justified such

actions in the name of safety, to avert danger to occupants even when there was none.[33]  Plaintiffs

also report inconsistent stories told by Defendants to justify their actions but only state one other

story - winter conditions - as an excuse for the delay in obtaining temporary C.O.'s over a year

---

[28]*Id*. at ¶ 83.

[29]*Id*. at ¶ 84.

[30]*Id*. at ¶ 85.

[31]*Id*. at ¶ 80.

[32]*Id*. at ¶ 86.

[33]*Id*.

after the original deadline.[34]  When Plaintiffs refused to close on the remaining units, Defendants demanded closure, and threatened forfeiture of Plaintiffs investment, over a year after the deadline and after failing to cure "severe and substantial deficiencies."[35]  Plaintiffs filed a notice of interest to protect their interests but Defendants have listed the units anyway.[36]  Plaintiffs claim that title to at least one of the units has been transferred but do not specify which unit.[37]

## II. Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiff as the nonmoving party in this case.[38]  This standard applies to both the original and amended complaint.[39]  Plaintiff must provide "enough facts to state a claim to relief that is plausible on its face."[40]  But, the court "need not accept conclusory allegations without supporting factual averments."[41]  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the

---

[34]*Id.*

[35]*Id.* at ¶ 87.

[36]*Id.* at ¶ 88.

[37]*Id.*

[38]*Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).

[39]*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[40]*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007) (dismissing complaint where Plaintiffs "have not nudged their claims across the line from conceivable to plausible").

[41]*Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).

plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[42]

The Supreme Court has explained that a plaintiff must "nudge[ ][his] claims across the line from conceivable to plausible" in order to survive a motion to dismiss.[43] Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims.[44]

### III. Discussion

*A. First Cause of Action: Federal Securities Violation*

The Tenth Circuit has held that determining whether a particular contract is an investment contract within the meaning of federal securities laws is a question of fact that is rarely appropriate for a motion to dismiss.[45]  A court can grant a motion to dismiss a security claim only if there are no reasonable allegations of the existence of an investment intent and common enterprise and where the complaint also precludes finding a security.[46]  Before the Court addresses any of the collateral arguments it must first find sufficient allegations that a security did in fact exist.

Section 77 b(a)(1) of the Securities Act of 1933 defines a security as

---

[42]*Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[43]*Id*.

[44]*The Ridge at Red Hawk, LLC  v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[45]*Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549, at *5 (D. Utah October 30, 2007) (citing *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875, 877 (10th Cir. 1975)); *see also Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1040 (10th Cir. 1980).

[46]*Berrios-Bones*, 2007 WL 3231549, at *5.

> any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[47]

The term "investment contract" was defined in *SEC v. W.J. Howey*,[48] as a "transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party."[49]  In *Howey*, Florida orange growers offered customers the chance to purchase rows of orange groves and contract with a service company to cultivate, harvest, and market the crops.[50]  The customers were also supposed to share the resulting profits.[51]  The Court found an investment contract existed because "the seller was offering 'something more than fee simple interests in land.'"[52]

The *Howey* definition has since been broken down into a three part test: (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profit stemming from the efforts

---

[47]15 U.S.C. § 77b(a)(1).

[48]328 U.S. 293 (1946).

[49]*Id*. at 298-99.

[50]*Id*. at 300.

[51]*Id*.

[52]*Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (quoting *Howey*, 328 U.S. at 299).

of a third party. All three elements of the *Howey* test must be present for a land sale contract to constitute a security.[53]

The investment contract principle was also applied by the Court in *United Housing Foundation v. Forman*.[54] In *Forman*, a low-income housing cooperative required its tenants to purchase "stock" in the company managing the project.[55] Although the stock was basically a recoverable deposit on the apartment, the shares were nontransferable, could not be pledged or encumbered, descended only to a surviving spouse, and did not entitle the holder to voting rights.[56] The Court found that no security existed because the stocks as defined did not share any "characteristics traditionally associated with stock."[57]

Courts have held that the sale of a condominium, by itself, does not constitute a security transaction.[58] But even the *Forman* Court acknowledged in a footnote that a condominium sale could constitute an investment contract when the purchaser is offered both real estate and an expectation of profits.[59]

---

[53] *Id*; *see also Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (holding a contractual agreement to purchase real estate without more does not give rise to an investment contract).

[54] 421 U.S. 837 (1975).

[55] *Id*. at 837-38.

[56] *Id*. at 842.

[57] *Id*. at 851.

[58] *Mosher v. Southridge Associates*, *Inc.*, 552 F. Supp. 1231, 1232 (W.D. Pa. 1982)*; See Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1292 (S.D. Fla. 2007) ("Furthermore, under the definition of 'investment contract' as developed by the Court in *Howey* and *Forman*, the sale of a condominium generally would not involve an investment contract.").

[59] *Forman*, 421 U.S. at 853 n. 17.

Although not controlling, courts have relied on the SEC's similar interpretation of the condominium-security issue.[60]  In a 1973 release, the SEC stated that "[t]he offer of real estate as such, without any collateral arrangements with the seller or others, does not involve the offer of a security."[61]  The release goes on to state that

> the offering of condominium units in conjunction with any of the following will cause the offering to be viewed as an offering of securities in the form of investments contracts: (1) The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from the rental of units; (2) The offering of participation in a rental pool arrangement; and (3) The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.[62]

*Alunni v. Dev. Res. Group, LLC*,[63] a recent case from the Middle District of Florida is directly on point.  In that case, plaintiffs bought condominiums in a Florida development near Disney World.[64]  Plaintiffs were enticed into these purchases through radio advertisements and real estate workshops which were high-pressure sales pitches designed to induce attendees into purchasing condominiums in the Florida development.[65]  Plaintiffs alleged they were told they would receive immediate income from long term tenants already occupying over 94% of the

---

[60]*Revak*, 18 F.3d at 88-89; *Iman v. Hall*, 2009 WL 960474, at *4 (W.D. Va. April 7, 2009).

[61]*Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development*, 1973 WL 158443, Release No. 33-5347, 1 Fed. Sec. L. Rep. (CCH) ¶1049 (Jan. 4, 1973)

[62]*Id*.

[63]2009 WL 2579319 (M.D. Fl. Aug, 18, 2009).

[64]*Id*. at *2.

[65]*Id*. at *3.

units.[66]  Plaintiffs were told they did not have to manage their units, and that eventually the

development would be converted into a resort with its own management.[67]  Plaintiffs were even

given "conservative" estimates regarding the monthly income they could expect.[68]  Although the

*Alunni* court recognized that the purchase agreements "clearly contemplated that Plaintiffs were

buying their units with an intent to rent them on a short term basis,"[69] the court was unable to

disregard the clear language in the purchase contracts.  As noted by the *Alunni* Court, the very

first sentence of that purchase contract stated: "ORAL REPRESENTATIONS CANNOT BE

RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF

DEVELOPER."[70]  Additionally the purchase contract contained more than one express merger

clause.[71]

    Even recognizing that the developer knew it was the intent of the purchaser to place the

unit in a rental pool, the court found that no investment contract existed.[72]  The court noted a few

points in reaching its conclusion.  First, even though it was acknowledged and contemplated by

all parties that the units would be placed in a rental pool, nothing in the purchase agreement

---

[66]*Id*. at *3.

[67]*Id*.

[68]*Id*. at *3 n. 6.

[69]*Id*. at *5.

[70]*Id*. at *4 (citing Doc. 94-2 at 1).

[71]*Id*.

[72]*Id*. at *5, 8.

required or obligated any of the purchasers to do so.[73]  In fact, the court stated that, notwithstanding the short term rental provisions, the purchase contracts were the standard Florida condominium purchase agreements giving purchasers a fee simple interest in their units.[74]  The court also relied on the SEC guidelines which state, in addition to the parameters discussed above, that without a rental pool arrangement accompanying the purchase contract or some restrictions limiting the owner's control over the property, a real estate transaction does not constitute the sale of securities.[75]

In analyzing the common enterprise element of the *Howey* test, the court spent considerable time discussing the purchasers' retention of control of their units.  The court said that even if the pre-contract representations were a part of the transaction, the purchasers could not ignore the fact that they retained complete control over their condominiums.[76]  Additionally, in dismissing the contention that the merger clause had no effect on the case, the court stated in a footnote, that

> it seems incredible that anyone purchasing a $300,000.00 piece of property would blithely initial each page of, and then sign, an approximately 30 page purchase agreement without some scrutiny and that, as a matter of law, not one but two conspicuous merger clauses in that agreement would be of no moment.[77]

---

[73]*Id*. at *5.

[74]*Id*. at *5.

[75]*Id*. at *6 (citing *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development*, 1973 WL 158443, Release No. 33-5347, 1 Fed. Sec. L. Rep. (CCH) ¶1049 (Jan. 4, 1973)).

[76]*Id*. at *8.

[77]*Id*. at *8.

Plaintiffs here, as did the plaintiffs in *Alunni*, allege the real estate was a security as defined 15 U.S.C. § 77b(a)(1) and, as such, had to comply with registration and prospectus requirements of 15 U.S.C. § 77e.[78]  Defendants argue that this sale of real estate, is not a security and, even if it was, this action is barred by the statute of limitations set out in 15 U.S.C. § 77m. Defendants also argue that the relief requested under 15 U.S.C. § 77l is applicable only to the person who offers or sells the security, Defendant Paladin in this case.  Plaintiffs in turn argue it is a security as defined by the *Howey* test and Defendants should be equitably estopped from raising a statute of limitations defense.

Determining whether an investment of money has been made is straightforward and needs no other explanation.  Courts do vary though on what is needed to satisfy the common enterprise element.  Some courts view the common enterprise element as requiring either horizontal or vertical privity.[79]  The Tenth Circuit has expressly rejected the "horizontal commonality" requirement and instead analyzes the economic reality of the underlying transaction.[80]  This Court has stated that the "determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit."[81]  The Supreme Court has defined profit as "either capital appreciation resulting from the development of the initial investment . . .

---

[78]Plaintiffs actually just allege violations of 15 U.S.C. § 77 without including specific sections of the Securities Act of 1933, Defendants assume, as does this Court, that Plaintiffs meant § 77b(a)(1) and § 77e respectfully.  *See* Complaint, Docket No. 1 at pg. 3.

[79]*Revak*, 18 F.3d at 87; *Sec. & Exch. Comm'n v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974) (allowing for vertical commonality to satisfy the common enterprise prong).

[80]*McGill v. American Land &Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985).

[81]*Berrios-Bones*, 2007 WL 3231549, at *5.

or a participation in earnings resulting from the use of investors' funds."[82]  However, this Court does not need to further analyze either situation because, as stated above, in order for an offer of real estate to constitute a security there must be a collateral agreement with the seller or others, or some limitation on the owner's control over the property, which this Court finds did not exist here.[83]

Even if a collateral agreement was not necessary, this Court finds Plaintiffs have not met the common enterprise element.  Plaintiffs allege that this venture was a common enterprise because Plaintiffs' funds were to be used in the Defendants' construction of the property with the final objective being a profitable rental enterprise.[84]  In their Complaint though, Plaintiffs state they do not know where the earnest money received by Defendants was used.[85]  The contract merely states that the earnest money "shall be released to the Seller for Seller's use and shall become non-refundable to Buyer."[86]  As far as the Court can tell from the facts alleged by Plaintiffs, Defendants did not, and do not, intend to keep any of the units as their own rental properties.  Nowhere in the Complaint do Plaintiffs allege the contrary.  Therefore, even taking the facts in the light most favorable to the Plaintiffs, as is required in this case, the Court has been given no basis to find otherwise.  The properties are available only for the individual owners to rent out.  Moreover, it does not appear that Defendant is the rental agent.  Based on the pleadings

---

[82]*Id*. at *6 (citing *United Housing Foundation v. Forman*, 421 U.S. 837, 852 (1975)).

[83]*Alunni*, 2009 WL 2579319, at *6; *SEC Guidelines*, 1973 WL 158443.

[84]Docket No. 19, at 12.

[85]Docket No. 1, at ¶ 51.

[86]Docket No. 1, pg. 25.

it appears to the Court that Premier Resorts a/k/a Deer Valley Lodging, a Defendant who has not filed a motion to dismiss, would be the rental manager.[87]  As such, it would be the effort of Premier Resorts, not the other named Defendants, that would effect the profitability of both the owners' and Premier Resort's bottom line.

Further, it seems obvious, that Defendants would use the money received from Plaintiffs to continue to fund the development project, but the use of this money to finish the development by no means automatically turns the earnest deposit into a common enterprise.  As far as the Court can tell, the completion of the development would have no monetary effect to Plaintiffs. Although the Court must take all well plead facts as true, it does not have to accept general conclusions or allegations.  Plaintiffs have not stated or referred to anything specific regarding statements made about renting the condominiums and the profits they would receive therefrom. Moreover, if Defendants were the rental agent and were keeping some units for themselves to rent the outcome might be different.

Plaintiff alleges that the units were marketed as an investment opportunity, with specific emphasis on the economic benefits to be derived through the rental of the condominium properties.[88]  However, Plaintiffs do not allege any other collateral agreement regarding any rentals.  Moreover, there is no allegation that the ownership and control of the property was limited in any way.  Additionally, unlike *Alunni*, the purchase contract does not contemplate any rental pool or rental arrangement.  Even in *Alunni*, where the court found such a contemplation, a

---

[87]Docket No. 1 at ¶ 26.

[88]Docket No. 19 at 12.

investment contract was still not found.[89]  Many real estate purchases are entered into as

investments.  In establishing the existence of a security, it is not enough to allege a transaction

was entered into as an investment without alleging evidence of an additional agreement detailing

activities sufficient to form a common enterprise.  Due do the general investment-like quality of

real estate and the unusually high demand for rental properties in Park City, given its resort town

nature, there is no doubt that the developers probably used the renting feature, like the ski-in-ski

out feature, as a hook to lure investors.  However, marketing and advertising hooks do not change

the character of the transaction, nor are they generally representations upon which a purchaser can

reasonably rely especially in the face of clear language to the contrary.[90]

    The plain language of two sections of the Contract supports this conclusion and

contravenes Plaintiffs' claims.  Section 10.5 states

> Buyer acknowledges that neither Seller nor any of its agents or employees has
> made any warranties or representations upon which Buyer has relied concerning:
> (i) the investment value of the Silver Star residence; (ii) the possibility or
> probability of profit or loss resulting from ownership or rental of the Silver Star
> residence; or . . . . [91]

Similarly, paragraph 14 of the contract provides that

> Buyer and Seller acknowledge and agree as follows: (a) this Contract (which includes the
> Seller Disclosures and any attached addenda and exhibits), constitutes the entire
> agreement between the parties and supercedes and replaces any and all prior
> negotiations, representations, warranties and understandings or contracts between
> the parties. . . .[92]

---

[89]*Alunni*, 2009 WL 2579319, at *5.

[90]*Washburn v. Thomas*, 37 P.3d 465, 468 (Colo. App. 2001) ("any purported reliance on
the advertisement must fail in light of the conditions clearly spelled out in the bid card and the
written sales contract.").

[91]Docket No. 1, Ex. A at pg 27.

[92]*Id*. at 30.

Therefore, even if representations were made, it was inappropriate for Plaintiff to rely on them and, without a subsequent or collateral agreement, no investment contract can exist.  Moreover, the contract is written in relative plain English.  Each paragraph has a clear and concise heading, which is bolded and in capital letters.  Like the contract in *Alunni*, there are provisions disclaiming representations and reliances, in addition to a clear merger clause, which were initialed by Plaintiffs.  Additionally there is no allegation that Plaintiffs were not to retain 100% control over their units.  The *Alunni* court found it hard to believe that a buyer spending $300,000 on real estate would blindly initial and sign a 30-page contract without acknowledging its contents.  Here, Plaintiffs  bought two units for over two millions dollars, one unit for just under one million dollars and the last for just over one million dollars.  Plaintiffs signed and initialed a 34-page contract.  Under these circumstances, they may not disclaim the contents of the contract which were clearly laid out and duly acknowledged by them.

In sum, the Court does not find enough facts alleged in the complaint to find a security.  The Court finds this to be an even less compelling case than *Alunni*.  Here there is no mutually acknowledged contemplation of long term rental or investment property in the purchase contract.  The "something more" that existed in *Howey*, is not present in this case.[93]

However, even if this Court did find the contracts in question amounted to an investment contract and were therefore governed by federal securities laws, the Court finds this suit would be barred by the statute of limitations.  Both parties concede that the one year statute of limitations found in 15 U.S.C. § 77m, is applicable to this case.[94]  Plaintiff however, argues that the statute of

---

[93]*Howey*, 328 U.S. at 299.

[94]Docket No. 9 at 6; Docket No. 19 at 7-8.

limitations can be waived through the doctrine of equitable estoppel.  The Court finds no reasonable argument to support this position.

Because the Court does not find sufficient allegations to support the existence of an investment contract, and even if it were to presume an investment contract existed, the claim would be barred by the statute of limitations, the Court will dismiss the First Cause of Action.

### B. Second Cause of Action: Common Scheme to Defraud and Conspiracy to Deny Protections and Rights of Plaintiffs Under the Law

To bring a claim of fraud in Utah "a party must allege (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage."[95]  A fraud claim must be plead with particularity stating facts constituting the "who, what, when, where and how of the alleged fraud."[96]

"A duty to speak 'will not be found where the parties deal at arm's length, and where the underlying facts are reasonably within the knowledge of both parties . . .'"[97]  "Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of

---

[95]*Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066-67 (Utah 1996).

[96]*United States ex rel. Told v. Interwest Const. Co., Inc.*, 2008 WL 598120, at *2 (10th Cir. Mar. 4, 2008).

[97]*Debry v. Valley Mortg. Co.*, 835 P.2d 1000, 1007 (Utah Ct. App. 1992) (quoting *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980)).

trust, from confidence, inequality of condition and knowledge, or other attendant circumstances."[98]

Misrepresentations of law are generally not considered material facts upon which a plaintiff may rely for purposes of common law fraud because everyone is presumed to know the law and is bound to take notice of it.[99]  There are at least two generally accepted exceptions to this rule.  First, if a misrepresentation of law includes, either expressly or by implication, a misrepresentation of fact, it is justifiable to rely on the misrepresentation of fact as if it were like any other misrepresentation of fact.[100]  Second, an exception exists if the speaker sustained a confidential relation to the hearer, or possessed superior knowledge, or wilfully misled him into a misconception of his rights.[101]

Utah Administrative Rule 162-6.2.3, entitled Residential Construction Agreement, states "[t]he Real Estate Purchase Contract for Residential Construction must be used for all transactions for the construction of dwellings to be built or presently under construction for which a Certificate of Occupancy has not been issued."

Plaintiffs use Rule 162-6.2.3, and Defendants' non-compliance with it, as the basis of their

---

[98]*Elder v. Clawson*, 384 P.2d 802, 804 (Utah 1963) (quoting 23 Am.Jur. 853, Fraud and Deceit, IV Concealment, Sec. 77)).

[99]*Gadd v. Olson*, 685 P.2d 1041, 1044 (Utah 1984); *U.S. to Use of Hine v. Morse*, 218 U.S. 493, 510 (1910); *see also Presidio Exploration, Inc. v. Alexander Energy Corp.*, 1993 WL 53096, at *3 (10th Cir. February 23, 1993), *Am. United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 703 (Ind. Ct. App. 2004), *Fields v. Life & Casualty ins. Co.*, 349 F. Supp 612, 615 (E.D. Ky. 1972); 37 Am. Jur. 2d *Fraud and Deceipt* § 97-98 (2001).

[100]RESTATEMENT (SECOND) OF TORTS § 545.

[101]*Gadd*, 685 P.2d at 1044.

fraud claim.  Defendants argue that this cause of action should be dismissed for a variety of reasons.   The LaPay Defendants, et al, argue that Rule 162-6.2.3 of the Utah Administrative Code is only applicable to licensees of the Utah Real Estate Commission, and as none of these Defendants are such licensees, the rule is inapplicable to them.[102]   The LaPay Defendants, further argue that these regulations do not create a private right of action.[103]   The Prudential Defendants also contend that this claim of fraud fails because there is no duty of disclosure.[104]   Defendant Prudential, individually submitted an additional argument in conjunction with the Prudential Defendants general argument that Plaintiff ignored the language of 162-6.2.1.2.[105]   All Defendants argue that if a claim could be pursued, the Complaint fails to mention which defendants made representations, when they were made, and to whom they were made and therefore the cause of action does not comply with the specificity required by Fed. R. Civ. P. 9(b).[106]   The Peterson Defendants assert that, as this rule was in the public domain, it was "reasonably within the knowledge of both parties," and that parties are presumed to know the law.[107]   All Defendants argue, and Plaintiffs concede, that misstatements of law cannot create a claim of fraud.[108]

Plaintiffs argue that Utah Administrative Code, Rule 162-6.2.3 does apply to Defendants,

---

[102]Docket No. 9, pg 13.

[103]*Id.*

[104]Docket No. 13, pg. 7.

[105]*Id.*; Docket No. 23, pg. 9.

[106]Docket No. 23, pg. 9.

[107]Docket No. 13, pg. 8; Docket No.9, pg. 18.

[108]*Id.*; Docket No. 23, pg. 9

including individual Defendants LaPay and Murphy, in their capacity as real estate licensees, and imposes the mandatory use of a form contract for all transactions concerning construction of dwellings to be built.[109]  Plaintiffs also claim that Defendants possessed a superior knowledge of the real estate industry and were therefore under a duty to disclose the existence of the alleged "legally mandated form contract."[110]  Plaintiffs further counter that the misrepresentations of law included misrepresentations of fact because of Defendants LaPay, Murphy, Prudential, Peterson, Shoaf, Orrell, West, and Stoner's roles as a real estate agent licensees and are therefore liable for affirmative fraud while the remaining Defendants are liable only as collaborative parties to the fraud.[111]

Plaintiffs allege that Rule 162-6.2.1 applies to LaPay, Murphy, Peterson, Shoaf, Orrell, West, Stoner and Prudential due to their status as real estate brokers.  The Complaint though, only lists Murphy as an individual and agent/manager of Paladin.  Because the Court must take all well plead allegations by the nonmoving party, Plaintiff in this case, as true, it must accept as fact for the time being that everyone alleged to be acting as an agent on behalf of Prudential, excluding Murphy, was in fact doing so.  However, the Court agrees with Defendants that this administrative rule does not create a private right of action.

This set of regulations were adopted by the Commission of the Division of Real Estate of the Utah Department of Commerce.[112]  As set forth in § 61-2-5.5, of the Utah Code Ann., the

---

[109]Docket No. 18, pg. 17; Docket No. 19, pg. 19.

[110]*Id.*

[111]*Id.*

[112]Docket No. 9, at 14; *See* UTAH CODE ANN. § 61-2-5.5.

statute creating the Commission of the Division of Real Estate, its function is the regulation of real estate licensees, such as real estate brokers and agents.[113]   The Commission is not empowered to regulate real estate transactions generally.[114]   It has been established in jurisdictions throughout the country that the violation of a rule adopted to regulate real estate brokers and agents does not create a private cause of action, even against brokers and agents.[115]   The Court takes the language of the statute itself as instructive regarding the authority the Commission has.   As stated above, the statute clearly states that the Commission does not have the power to regulate real estate transactions generally.   The Court finds no private right of action exists here.

Additionally, the Court finds there was no duty to disclose as everyone is presumed to know the law.[116]   Since the law is not a material fact, any silence under the facts presented here, does not constitute actionable fraud.[117]   Therefore the claim for fraud in the omission will be dismissed.   As to Plaintiffs' claim that, in addition to claiming fraud by omission, there is also affirmative fraud which does not require a duty to disclose, the Court does not find Plaintiffs' argument to be persuasive.   After combing through the Complaint, the Court has not found any allegations of any affirmative statements made about the form used, nor are there allegations

---

[113]UTAH CODE ANN. § 61-2-5.5

[114]UTAH CODE ANN. § 61-2-20.

[115] *Marra v. Burgdorf Realtors, Inc.*, 726 F. Supp 1000, 1011-12 (E.D. Pa. 1989); *See Magliaro v. Lewis*, 417 S.E.2d 395, 397 (Ga. Ct. App. 1992) (stating that a breach of the regulatory provision alone will not support a separate cause of action)*; See also Lock v. Schreppel*, 426 A.2d 856, 865 (Del. Super. Ct. 1989); *Wick Realty v. Napili Sands Maui Corp.*, 620 P.2d 750, 754 (Haw. Ct. App. 1980).

[116]*Gadd*, 685 P.2d at 1044.

[117]*Interwest Const. Co., Inc.*, 2008 WL 598120, at *2.

regarding who made the statements, when or how they were made.  In fact, Plaintiffs allege that they were never made aware by Defendants that there was a standard contract, or highlighted the differences between the standard and the contract signed by both parties.[118]  Therefore, the Court finds the only fraud claim that could possibly stand is one of omission and, without finding a duty to disclose, that possibility is also foreclosed at this point.

The Court will dismiss the Second Cause of Action because it finds no private right of action, and therefore no legal basis for fraud, no duty to disclose, and a failure to meet the specific pleading requirements of Rule 9(b).

## C. Third Cause of Action: Reckless and Intentional Violations of State and Federal Securities Law

Plaintiffs' allege that the $1,000,000 earnest money payment was an investment, or security without exemption.   Both the Defendants and the Court are unclear as to what exact type of claim Plaintiffs are attempting to state.  Plaintiffs allege a violation of a State securities law, but fail to cite any such law.  Plaintiffs already alleged violations of Federal securities laws as discussed earlier.  Because the Court has already established that it does not find the sale of the condominiums to constitute a security under Federal law, no other basis for a Federal securities law violation have been alleged, and no state law cited, the Court finds no foundation for this claim.  Therefore Plaintiffs have failed to state a claim upon which relief can be granted.

## D. Seventh Cause of Action: Costs, Interest and Attorney's Fees

Defendants argue that this claim must be stricken or dismissed because it is not an independent cause of action under Rule 8(a).  Rule 8(a) states that a claim for relief must contain a

---

[118]Docket No. 1, at ¶ 36.

short and plain statement of the claim demonstrating the pleader is entitled to relief in addition to a demand for the relief sought.[119]  Plaintiff states they included the claim of relief at the end of the Complaint to avoid redundant and duplicative pleadings.  The Court as well as the Federal Rules of Civil Procedure frown on redundant pleadings and Rule 12(f) gives the Court power to strike a redundant pleading.  The Court finds no basis in the law for Defendants arguments.  The Court is sympathetic to Plaintiffs reasoning in stating its claim for relief only once at the end of its Complaint, and finds this is an acceptable method of pleading.  Therefore the Court will refrain from dismissing this cause of action.

### IV. Conclusion

Based on the above, it is hereby

ORDERED that the LaPay Defendants' Motion to Dismiss (Docket No. 8) is GRANTED as to Causes of Action One, Two, and Three and DENIED as to Cause of Action number Seven. It is further

---

[119]FED. R. CIV. P. 8(a).

ORDERED that the Prudential Defendants' Motion to Dismiss (Docket No. 12) is GRANTED.  As the only remaining claims, Causes of Action Four and Six, are specifically alleged against Defendant Wrona, who was not a party to this Motion, the Prudential Defendants are hereby DISMISSED from this case.

DATED   November 17, 2009.

BY THE COURT:

_____
TED STEWART
United States District Judge